UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 20-81237-CIV-SMITH

PATRICK MCFADDEN,

    Plaintiff,

vs.

CITY OF BOYNTON BEACH, *et al.*,

    Defendants.

_____/

**ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGEMENT**

This cause is before the Court on Defendant Mark Sohn's ("Sohn") Motion for Summary Judgment [DE 31], Plaintiff's Response [DE 48], and Sohn's Reply [DE 52]. Also, before the Court are Defendant City of Boynton Beach's ("the City") Motion for Summary Judgment [DE 34], Plaintiff's Response [DE 46], and the City's Reply [DE 55]. This action arises from an incident in which a 911 caller reported a domestic dispute that resulted in the arrest of Plaintiff for fleeing and eluding the police and resisting an officer without violence. Plaintiff's three-count Complaint alleges (1) a state law claim for battery against the City, (2) a state law claim for battery against Sohn, and (3) an unreasonable use of force claim against Sohn. The City has moved for summary judgment on Count I, and Sohn has moved for summary judgment on Counts II and III. For reasons that follow, both motions are granted.

**I.   UNDISPUTED MATERIAL FACTS**[1]

On September 4, 2017, Plaintiff and two female passengers were sitting in Plaintiff's vehicle at a shopping center parking lot in Boynton Beach, Florida. The City's police officers, Officer Daryn Whitefield and Detective Danielle Whitefield were dispatched to that

---

[1] The Court omits record citations to the facts that the parties have not disputed.

location in response to an unidentified female's call to 911, placed at 4:08 p.m. The caller reported a domestic dispute in which a black male and a white female were "beating the crap out of each other" and arguing heatedly, in a white SUV at a shopping center in Boynton Beach. Later in the call, the caller indicated that the female was the one hitting the male. (Computer Aided Dispatch ("CAD") Report [DE 46-33] at 4.) When Detective Whitefield arrived on the scene to investigate, she observed a male and female in a white SUV arguing heatedly. Upon seeing Officer Whitefield's and Detective Whitefield's patrol cars approaching, Plaintiff left the scene by driving around Detective Whitefield's patrol car and onto Federal Highway before the officers could begin their investigation.

After receiving approval from shift supervisor Henry Crowell ("Crowell"), Officer Whitefield and Detective Whitefield started to pursue Plaintiff's vehicle with Officer Whitefield leading. Crowell authorized pursuit on the basis that a potential abduction was underway. Officer Whitefield and Detective Whitefield turned on their patrol cars' lights and sirens to signal to Plaintiff to stop. Plaintiff failed to stop so Officer Whitefield and Detective Whitefield closely followed the white SUV throughout Boynton Beach with their lights and sirens activated. During the pursuit, Detective Whitefield observed a female passenger discarding hypodermic needles on to the roadway. (Danielle Whitefield Dep. [DE 45-2] 10:14-18.)

Plaintiff eventually exited onto the I-95 South highway, at which point the City's Officer Shepaum and Sergeant Daniel Dugger joined the pursuit. At 4:23 p.m., Mark Sohn ("Sohn"), a City K-9 officer, joined the pursuit by taking the lead.[2] Using the vehicle's public address ("PA") system, at 4:24 p.m., Sohn commanded Plaintiff to pull over stating, "[t]his is Boynton Beach Police Department. You need to pull your vehicle over to the side of the road immediately. I am

---

[2] It is the City of Boynton Beach Police Department's policy for a K-9 unit to take the lead in pursuits.

2

a K-9 unit with a dog. Do not get yourself hurt. I will use my dog to apprehend you. Pull your vehicle over to the side of the road." (Sohn Dash Cam Video [DE 32-7] at 08:14-08:27.) However, Plaintiff failed to comply.

At this point, Plaintiff was driving at eighty miles per hour, exceeding the posted speed limit on I-95 South. (Incident Report [DE 32-5] at 1 ¶ 2.) Sohn observed a female passenger in the rear seat and another in the front passenger seat of Plaintiff's vehicle and used the PA system to ask whether they were injured or needed help. (Sohn Dash Cam Video at 08:32-08:42.) The female in the rear seat had her hands raised above her head. (*Id.*; Sohn Decl. [DE 32-8] at ¶ 11.) At 4:25 p.m., Sohn again commanded Plaintiff to pull over his vehicle. (Sohn Dash Cam Video at 08:32-08:42.) Sohn told Plaintiff that he would be placed under arrest and that the police would continue to pursue him. (*Id.*) Plaintiff continued to drive and again refused to comply. One minute later, Sohn stated again that he was with the City's police department and commanded, "You are under arrest, pull your vehicle over to the side of the road." (*Id*. at 10:24.) Plaintiff continued driving and refused to comply. Between 4:27 and 4:33 p.m., Sohn instructed Plaintiff six times to pull over and stop his vehicle. Each time, Plaintiff refused to comply and continued driving. (*Id*. at 11:29-17:58.)

At 4:38 p.m., Plaintiff exited I-95 at Commercial Boulevard in Broward County. At this point, several Broward Sheriff's officers joined the pursuit. Sohn made another appeal to Plaintiff to pull over at 4:40 p.m., after advising him that the pursuit had been joined by the Broward Sheriff's Office. (*Id.* at 25:50-25:56.) Plaintiff continued to drive, refusing to comply. Subsequently, Plaintiff was seen slamming on his brakes to avoid rear-ending a vehicle causing his tire to appear to smoke. (Sohn Dash Cam Video at 27:31-27:35.) At 4:43 p.m., Sohn observed the female passenger in the rear of Plaintiff's vehicle signaling for help and making attempts to leave the vehicle. (*Id.* at 27:49.) As Plaintiff continued to drive in non-compliance with Sohn's

3

instructions, the female in the rear seat raised her hands above her head for the rest of the pursuit.

Throughout his pursuit, Sohn kept dispatch apprised of his observations and the fact that Plaintiff was not complying with Sohn's repeated instructions for Plaintiff to pull over his vehicle and to stop. After Sohn advised dispatch of his observation of the female passenger in the rear of Plaintiff's vehicle attempting to leave the vehicle while it was in motion, dispatch informed Sohn that Plaintiff was on the phone with a Broward Sheriff's 911 operator. (*Id.* at 29:32-31:41.) Dispatch told Sohn that Plaintiff was refusing to stop because he had just been released from prison and did not want to get in trouble and go back to prison. Thereafter, Sohn using his vehicle's PA system, advised Plaintiff that the officers knew he was on the line with 911 and commanded him to pull over. (*Id.* at 31:50.)

Plaintiff testified at his deposition that he had told the Broward Sheriff's 911 operator that he was in fear for his life. (Pl.'s Dep. [DE 35-6] at 81:9-23.) Plaintiff also stated that before he brought his vehicle to a stop, he advised the operator that he was surrendering but that he did not want to be harmed. (*Id.*) Plaintiff asserts that the 911 operator indicated that she would relay to the officers on the scene that Plaintiff was surrendering. (*Id.*)

After more than thirty minutes of refusing to comply with multiple signals to stop and at least thirteen commands to pull over from Sohn over his vehicle's PA, Plaintiff's vehicle came to rest at the intersection of 1800 Sample Road in Broward County. The intersection was busy, and the traffic light was red. Plaintiff's vehicle was in the middle lane with vehicles in the lane to his left and to his right. Based on their observation of the actions of the female passengers in Plaintiff's vehicle, the initial 911 call by the unidentified female, Plaintiff's failure to stop the vehicle in response to Officer Sohn's multiple commands, Plaintiff telling the Broward Sheriff's 911 operator that he did not want to go back to prison, and the number of civilian vehicles using the intersection, the officers approached Plaintiff's vehicle as a felony stop.

Sohn pulled up behind Plaintiff and exited his marked patrol car with his gun drawn and K-9, Bako, harnessed. Sohn had no way of knowing if anyone in Plaintiff's vehicle was armed. Several other patrol vehicles including City officers, law enforcement officers from the Broward Sheriff's Office, and officers from the Florida Highway Patrol arrived on the scene in the moments following. (Sohn Dep. [DE 35-5] at 29:15-20.) As they arrived, some of the patrol cars' lights were flashing and sirens were also on. Sohn and Detective Whitefield gave multiple verbal commands to Plaintiff, instructing him to exit the vehicle. Again, Plaintiff failed to comply. Sohn and the officers from Boynton Beach, the Broward Sheriff's Office, and the Florida Highway Patrol, who had arrived on the scene, considered Plaintiff a flight risk and a danger to the officers and pedestrians in the area. (Danielle Whitefield Dep. [DE 35-2] at 36:21-37:11; Dugger Dep., [DE 35-10] at 30:2-7.)

As Sohn approached Plaintiff's vehicle from behind, he saw the female passenger in the rear seat with her two hands still raised and extended outside her passenger window. Initially, Sohn could not see Plaintiff's hands. (Sohn Dep. at 27:7.) As he moved closer, he saw Plaintiff's hands raised near his face and that Plaintiff was holding an unidentified object in in his right hand. (*Id.* at 27:12.) Because Plaintiff's vehicle was still operational, and the female passengers were still in the vehicle, Sohn (whose body camera was facing Plaintiff's left side) repeated several commands for Plaintiff to exit Plaintiff's vehicle. Still, Plaintiff refused to exit the vehicle. At his deposition, Plaintiff testified that he did not recall whether he heard the commands to exit the vehicle after he stopped at the stoplight. (Pl.'s Dep. [DE 35-6] at 93:2-4.)

The vehicle which was in the left lane beside Plaintiff pulled forward to drive through the intersection leaving the lane beside Plaintiff free and clear. The vehicle which was now in the middle of the intersection slowed to allow a patrol car to come through the intersection to come to a stop facing Plaintiff's vehicle. As this one patrol vehicle was in front of Plaintiff's vehicle and

5

Sohn's was behind Plaintiff's vehicle, Plaintiff had space in both the left lane and the right lane on either side of him if he chose to flee again.  Sohn then released K-9 Bako to apprehend Plaintiff.  K-9 Bako jumped through the driver's window and bit Plaintiff's left hand.  When an unidentified Broward Sheriff's officer came up to Plaintiff's vehicle, Plaintiff told the unidentified Broward Sheriff's officer that he could not get the door open.  Sohn instructed K-9 Bako to release Plaintiff.  K-9 Bako bit Plaintiff's hand for approximately twenty-five seconds.  As the unidentified Broward Sheriff's officer attempted to pull Plaintiff out of his vehicle, Plaintiff unlocked his door and fell sideways.  Plaintiff was then handcuffed and placed under arrest for fleeing and eluding, a felony in violation of section 316.1935, Florida Statutes, and resisting arrest without violence, in violation of section 843.02, Florida Statutes.  After Plaintiff was secured, other officers extracted the female passengers from the car and placed them under arrest.  Sohn then rendered first aid to Plaintiff by applying gauze pads and wrapping Plaintiff's wrist.  Broward Fire Rescue was summoned and subsequently transported Plaintiff to Broward Health Hospital, where he was treated for his injuries.

Plaintiff suffered a complex wound measuring approximately five centimeters on his left forearm where K-9 Bako bit him.  (Wigoda Dep. [DE 45:15] at 11:9-10.)   Plaintiff's treating physician at Broward Health North, Dr. Paul Wigoda, noted in Plaintiff's chart that there was no clear sign of tendon or nerve injury. (*Id.* at 18-19.)  Plaintiff's wound was repaired, and Plaintiff was discharged with an antibiotic.  (*Id.* at 19-20.)   Dr. Kenneth Garrod, a board certified Orthopedic and Hand Surgeon, performed a medical examination of Plaintiff's injuries sustained during his arrest.  (*See* DE 27.)  Dr. Garrod found that Plaintiff's injuries had fully healed and that Plaintiff has no permanent abnormalities from the incident, aside from a scar.  (Garrod Dep. [DE 35:12] at 11:3-5.)  Plaintiff testified at his deposition on January 20, 2021, that he experienced pain in the vicinity of the scar from his wound.  (Pl.'s Dep. [DE 45-4] at 52:11-53:15; 55:2-56:19.)

When asked, Plaintiff did not describe his pain with particularity. Plaintiff claimed no other damages arising from the dog bite. (*Id.*)

Officer Brian Goldfuss ("Goldfuss"), the City's corporate representative, testified regarding the City's policy on felony vehicular stops and high-risk vehicular stops. He admitted that traffic stops were one of the biggest dangers that officers can face on the job. (*Id.* at 39:15-40:13.) He confirmed that, during a high-risk felony stop, the dangers posed were greater, not just to police officers, but also to occupants of the vehicle being stopped and members of the public in the vicinity of the stop. (*Id.*) He recognized that in exigent circumstances, the biggest priority was to remove from the stopped vehicle the person whom the officer is concerned is posing the risk. (*Id.* 41:20-42:1.) He acknowledged that one option under the City's police department training policy was for an officer in a high-risk felony stop to utilize a canine to enter the passenger compartment of the vehicle to remove a person who is not complying with verbal commands. (*Id.* at 38:12-22.)

Sergeant Jon Kautz ("Kautz"), the City's corporate representative on the City's use of force policy, testified that it was not appropriate to release K-9s to apprehend a suspect who surrendered. (Kautz Dep. [DE 45-17] at 12: 11-15.) With the caveat that it would depend on the totality of the circumstances, Kautz admitted that a person who had not been complying with police commands following a vehicular pursuit was not considered a suspect who was surrendering. (*Id.* at 16:9-17:2.)

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when "the pleadings . . . show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *HCA Health Servs. of Ga., Inc. v. Emps. Health Ins. Co.*, 240 F.3d 982, 991 (11th Cir. 2001). Once the moving party demonstrates

the absence of a genuine issue of material fact, the non-moving party must "come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)). The Court must view the record and all factual inferences therefrom in the light most favorable to the non-moving party and decide whether "'the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997) (quoting *Anderson*, 477 U.S. at 251-52)).

In opposing a motion for summary judgment, the non-moving party may not rely solely on the pleadings, but must show by affidavits, depositions, answers to interrogatories, and admissions that specific facts exist demonstrating a genuine issue for trial. *See* Fed. R. Civ. P. 56(c), (e); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). A mere "scintilla" of evidence supporting the opposing party's position will not suffice; instead, there must be a sufficient showing that the jury could reasonably find for that party. *Anderson*, 477 U.S. at 252; *see also Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990).

### III. DISCUSSION

Plaintiff stipulates to the fact that his arrest was lawful and that, at all relevant times, Sohn was acting in the scope of his discretionary authority. The state law battery claims Plaintiff asserts against the City and Sohn in Counts I and II of the Complaint and the claim for violation of 42 U.S.C. §§ 1983 and 1988 against Sohn in Count III, all turn on Plaintiff's allegation of an unreasonable use of force when Sohn used K-9 Bako to apprehend Plaintiff during Plaintiff's arrest. The City and Sohn each argue entitlement to summary judgment on Plaintiff's state law battery claims because Sohn's use of K-9 Bako to apprehend Plaintiff was reasonable. Sohn also maintains that he is entitled to summary judgment on Plaintiff's claims based on qualified immunity. Because each of Plaintiff's claims require a finding of unreasonable or excessive use

of force, the Court will consider whether Plaintiff can establish Counts I-III of the Complaint. Next, the Court will consider Sohn's defense of qualified immunity.

### A. Use of Force

Under Florida law, an officer's use of force in making a lawful arrest is generally accorded the presumption of good faith. *City. of Miami v. Sanders*, 672 So. 2d 46, 47 (Fla. 3d DCA 1996); *Jennings v. City of Winter Park*, 250 So. 2d 900 (Fla 4th DCA 1971). To overcome the presumption of good faith, a plaintiff must establish that the officer used force that is clearly excessive. *Sanders*, 672 So. 2d at 47 (finding that excessive force transforms ordinarily protected use of force into a battery). In determining whether an officer's use of force was excessive, courts apply the same analysis as that used when analyzing a claim under the Fourth Amendment. *Cordoves v. Miami-Dade Cnty.*, 92 F. Supp. 3d 1221, 1235 (S.D. Fla. 2015). "The Fourth Amendment's freedom from unreasonable searches and seizures encompasses the plain right to be free from the use of excessive force in the course of an arrest." *Id.* (internal citations omitted).

In evaluating an excessive force claim under the Fourth Amendment, the court considers "whether the officers' actions are 'objectively reasonable' *in light of the facts and circumstances confronting them*, without regard to their underlying intent or motivation" *Graham v. Connor*, 490 U.S. 386, 397 (1989) (emphasis added). A court views things from the vantage point of the reasonable officer at the scene, while recognizing that officers must make in-the-moment judgment calls under ever-evolving circumstances and not with the hindsight of 20/20 vision. *Id.* at 386-87; *Garczynsi v. Bradshaw*, 573 F.3d 1158 (11th Cir. 2009). "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers . . . violates the Fourth Amendment." *Graham*, 490 U.S. at 396.

The Eleventh Circuit has found the use of canines to effect lawful arrests to be reasonable when apprehending a fleeing suspect. *See Crenshaw v. Lister*, 556 F. 3d 1283, 1291 (11th Cir.

2009) (reasonable use of canine to apprehend suspect who fled and eluded police by vehicle, although he communicated to officers that he was in the act of surrendering); *Anderson on behalf of MA v. Vazquez*, 813 F. App'x 358, 361 (11th Cir. 2020) (use of canine to stop a minor was not constitutionally unreasonable where minor and others committed auto burglary, failed to comply with commands, potentially carried a weapon, fled through a populated area, and the officer commanded the dog to let go within 30 to 40 seconds and nothing adequately contradicted the officer's testimony that he was unable to see that the suspect was a minor). On the other hand, using a canine on a suspect who has already surrendered has been found to be an unlawful use of force. *See Priester v. City of Riviera Beach*, 208 F.3d 919, 927 (11th Cir. 2000) (use of canine who bit Plaintiff for almost two minutes was unreasonable use of force when Plaintiff had immediately complied and had already surrendered by laying on the ground).

"Objective reasonableness" is the test for excessive force claims. *Graham*, 490 U.S. at 386. The Court must consider: "(1) the need for the application of force, (2) the relationship between the need and amount of force used, and (3) the extent of the injury inflicted." *Hadley v Guttierez*, 526 F.3d 1324, 1329 (11th Cir. 2008). The second factor regarding the relationship between the need and amount of force used is measured by "(1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 386.

In determining whether Sohn's conduct in this case was reasonable, the Court must analyze the totality of the circumstances as viewed by the officers in the heat of the moment. In this case, the totality of the circumstances requires consideration of not just when the canine was deployed but when the officers first attempted to stop Sohn. First, prior to arrest, Plaintiff was being pursued on suspicion of abduction of two females following the report of a domestic dispute. Second, just

as the officers arrives on the scene to investigate, Plaintiff fled and eluded the police officers for more than thirty minutes.[3] Third, Plaintiff's recklessness in evading capture posed great danger to both the officers pursuing him and other civilians; he drove at excessive speed, almost rear-ended another motorist, and kept driving even as the female passenger in the rear seat of his vehicle attempted to exit the vehicle. Fourth, Plaintiff resisted arrest by refusing to exit his vehicle and held an unidentified object in his hands, which reasonably led the officers to believe that he might be holding a weapon.[4] Fifth, Plaintiff was a flight risk, as shown by the high-speed chase, his ongoing refusal to pull over, and his vehicle, although stopped at a busy intersection, remained operational with a path of escape if Plaintiff chose to flee. Finally, K-9 Bako was deployed for approximately twenty-five seconds as a means of getting Plaintiff to exit the vehicle and the injury from the bite resulted in no permanent disability to Plaintiff's hand.

Based on the foregoing, no reasonable officer in possession of the facts and circumstances in this matter would find that the force used to arrest Plaintiff was excessive. K-9 Bako apprehended Plaintiff for only twenty-five seconds under circumstances where Plaintiff failed to surrender after repeated instructions to do so by the officers. In *Vazquez*, the court found that the use of the canine to apprehend the minor suspect was an exercise of reasonable force where the minor had committed burglary, failed to comply with the officer's commands, had fled into a populated area, potentially carried a weapon, and the officer commanded the dog to let go within

---

[3] Plaintiff was eventually charged with violation of section 316.1935, Florida Statutes, and resisting arrest without violence, in violation of section 843.02, Florida Statutes.

[4] While Plaintiff argues that there is a question of fact as to whether he was surrendering, at the time K-9 Bako was deployed 1) Plaintiff had refused to exit the vehicle after being instructed to do so eleven times and after eluding the police officers for more than thirty minutes, and 2) unlike his female passengers, his hands were still in the car, and though raised, his hands were not empty. Based on these circumstances, it was reasonable for Sohn to believe that Plaintiff was not surrendering. *Crenshaw*, 556 F.3d at 1293 (finding that it was objectively reasonable for the officer to question the sincerity of defendant's attempt to surrender and use the canine to apprehend the defendant.)

thirty to forty seconds. 813 F. App'x at 361. Here, the amount of force used was no greater than the amount needed to get Plaintiff to exit Plaintiff's vehicle. Like in *Vazquez*, Plaintiff was at a busy intersection, failed to comply with the officers' commands, and was suspected of having a weapon. When balanced against the officers' suspicion that the female passengers in the car were being abducted, Plaintiff's fleeing and eluding the officers for more than thirty minutes across two counties, the harm posed to the occupants of Plaintiff's vehicle and the motoring public, and the non-permanent injury suffered by Plaintiff, the use of K-9 Bako to apprehend Plaintiff was a use of reasonable force. The use of K-9 Bako to apprehend Plaintiff does not violate the Fourth Amendment. Accordingly, Plaintiff's state law battery claims and §§ 1983 and 1988 claims fail and Sohn and the City are entitled to a grant of summary judgment on their claims.

### B. Qualified Immunity

Qualified immunity shields public officials from suit against them in their individual capacities, except in scenarios where their conduct contravenes "clearly established statutory or constitutional rights . . . which a reasonable person would have known." *Dalrymple v. Reno,* 334 F.3d 991, 994 (11th Cir.2003) (internal citations omitted). To claim qualified immunity, "a public official must prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." *Gilmore v. Hodges*, 738 F.3d 266, 272 (11th Cir. 2013). "Once the official has done so, the burden shifts to the plaintiff to satisfy the following two-pronged inquiry: (1) whether the facts that a plaintiff has shown make out a violation of a constitutional right; and (2) whether the right at issue was clearly established at the time of the defendant's alleged misconduct." *Id.*

Plaintiff stipulates to the fact that his arrest was lawful and that Sohn's complained of conduct occurred while Sohn was acting in the scope of his discretionary authority. Thus, the burden shifts to Plaintiff to demonstrate that his constitutional right was violated and that it was

clearly established at the time of Sohn's alleged misconduct. Plaintiff "must show that [officer]'s conduct was so far beyond the hazy border between excessive and acceptable force that an official had to know he was violating the Constitution even without caselaw on point. This test entails determining whether application of the excessive force standard would inevitably lead every reasonable officer in a defendant's position to conclude such force was unlawful." *Priester,* 208 F.3d at 922.

Taking the facts in the light most favorable to Plaintiff and for the reasons explained in Section A above, the Court concludes that a reasonable officer would believe that the amount of force utilized by Sohn was reasonable. Sohn deployed K-9 Bako for no more than 25 seconds to aid in removing Plaintiff from the vehicle to effect Plaintiff's arrest. At the time, Plaintiff had not complied with multiple orders to exit the vehicle. Thus, the force was reasonable under the circumstances, does not violate the Fourth Amendment, and Sohn is entitled to qualified immunity.

Accordingly, it is

**ORDERED** that:

1. Defendant, Marc Sohn's Motion for Summary Judgment [DE 31] is **GRANTED.**

2. Defendant, City of Boynton Beach's Motion for Summary Judgment [DE 34] is **GRANTED.**

3. The Court will enter a separate judgment.

4. All pending motions not otherwise ruled upon are DENIED as moot.

5. This case is **CLOSED**.

**DONE and ORDERED** in Fort Lauderdale, Florida, this 28th day of March 2022.

RODNEY SMITH
UNITED STATES DISTRICT JUDGE

cc: Counsel of Record